STATE of Missouri, Respondent,

v.

Robert N. MURRAY, Appellant.

No. WD 31332.

Missouri Court of Appeals,
Western District.

Nov. 3, 1980.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Dec. 2, 1980.

Karl L. Madden, Jr., Moberly, for appellant.

John Ashcroft, Atty. Gen., Neil MacFarlane, Asst. Atty. Gen., Jefferson City, for respondent.

Before PRITCHARD, P. J., SWOFFORD, J., and FLANIGAN, Special Judge.

PRITCHARD, Presiding Judge.

By the verdict of a jury, appellant was found guilty of eleven counts of felonious stealing. Upon being found to be a second offender, the court sentenced him to ten years imprisonment on each count in the Division of Corrections, the sentences to run concurrently.

Appellant's points are: (1) the trial court erred in failing to grant a new trial because the amended information failed to state an offense in that it did not state a specific time when the crime was committed [apparently this assignment refers to each of the

eleven counts]; (2) the evidence was insufficient to support the finding(s) of guilt; and (3) the court erred in permitting the amended information to be filed because it charged appellant with offense(s) which in particulars were significantly different than the original charge(s) in that the amended information did not state dollar amount(s) value(s) except to state over fifty dollars and the amended information significantly changed the time when appellant was alleged to have committed the act(s). [Parentheses of the plural added.]

The amended information is in eleven counts in identical language except for the names of individual victims and type of grain and alleges that appellant "between the dates of March 15, 1976, and November 16, 1976, did then and there, willfully, unlawfully, feloniously and intentionally, steal the personal property of another to—wit: many bushels of wheat of the value of more than fifty dollars ($50.00), the goods and personal property of _____, with the felonious intent to steal by exercising dominion over said personal property in a manner inconsistent with the rights of said owner, by using, transferring, and concealing possession of said personal property, * * * ."

Appellant began working for the Boss Feed and Fertilizer Company, a feed and grain warehouse in Moberly, Missouri, on March 15, 1976, as a collector of accounts receivable. He gradually assumed a managerial capacity with the warehouse when Dick Collins, owner of 99% of the company, because of personal problems spent much time away from it. Collins discharged appellant on November 15, 1976.

These eleven persons alleged to be victims testified as to deposits of grain in the Boss warehouse, and the values of the grain as follows: Otis Kesner deposited 235.67 bushels of wheat in July 1975. It was worth $2.37 per bushel (total $497.00, less storage); he was never paid for it; and gave no consent for it to be sold or moved. Roy Hannah deposited his 1975 crop of soybeans, 571 bushels worth $3,951.00, less storage, $171.49; his 1976 crop, 166 bushels of wheat worth $1,417.37, and 1976 soybeans worth $1,143.18. The total amount owed by Boss to Hannah was $6,340.30 for which he did not get paid, and he gave no consent to sell or move his grain. Glen Isringhausen stored 8,336 bushels of wheat with the Boss warehouse in 1976. It was worth $23,000 to $24,000 and he never got paid for it. Appellant told him that there was not as much wheat in storage as he had deposited. Alvin Wilkinson stored 431.67 bushels of wheat in 1975 or 1976, for which he was never paid, and which was worth a net of $806.01. Arthur Duffield deposited 1,039 bushels of soybeans in 1974, and 887 bushels of soybeans in 1975. Although it is not quite clear from Duffield's testimony, the net value of the 1974 soybeans was $5,876.31, and by computation, the 1975 crop at $6.92 per bushel would have had a gross value of $6,138.04. He gave no consent or permission to anyone at Boss to sell or move his soybeans. Merlin Riley, on July 7, 1976, deposited $1,294.25 worth of wheat at $2.37 or $2.39 per bushel, and although he requested, he received no money for it. Jerry Sumpter's 383.74 bushels of soybeans were deposited with Boss in 1976, for which he was never paid. In November of that year, he asked for his beans and was told by appellant that the beans were in a farm bin down by Clark, Missouri, and they would have to get a tractor and an augur to get them, and Sumpter told him he would be there with a truck. Apparently, this transaction was never accomplished. Ethel White deposited 808 bushels of soybeans with Boss in October, 1975, was offered $6.92 per bushel for them in January, 1977, but was not paid for them. Leonard Huss deposited 193.5 bushels of left—over seed wheat on November 12 and 13, 1976, priced at $448.11 in January, 1977, for which he was not paid. Glenwood Spurling stored soybeans at Boss' in 1974 and 1975, but got paid for the 1974 crop, 600 bushels. He did not get paid for 1183 bushels stored in 1975, worth $6,200, and he did not give permission to anyone to sell those beans. Elwyn Owings had a landlord's share of soybeans, 31.88 bushels stored on November 22, 1976 (after appellant's discharge), but he was not

paid for 87.96 bushels of soybeans stored on November 5, 1976, worth $6.92 per bushel.

Larry Case had been a grain warehouse auditor for the Missouri Department of Agriculture since 1976. His duties were to determine how much storage (capacity) was contained in the elevator, how many accounts were owed to customers, and how much grain was in the facility, to be sure everything was in balance. Measurement of grain, although not exact, can be 1% tolerance. Wheat in a wheat bin from customers is commingled.

Case first audited Boss in December, 1976, with these results: As of December 1, 1976, there were obligations to customers for 10,232.34 bushels of wheat in storage and there were actually 824 bushels in the bins, a shortage of 9,408 bushels. Obligations for soybean storage were 4,994.79 bushels, and Case found 1,146 bushels there, which left a shortage of 3,849 bushels. There were also shortages of yellow corn, oats and grain sorghum. No shortages appeared on the October, 1976 audit. Boss had closed by February, 1977. During the week–long December audit, Case talked with appellant, there being three other department employees present at which time appellant "made a statement to the effect that he had tried both sides of the law and that he had apparently found it to be much more fun and much more profitable to be dishonest."

Lee Spangler worked at Boss. After appellant arrived, paychecks got shaky, and checks were made out, signed and handed back to appellant who would count out the cash for employees.

Dick Collins (owner of Boss) testified that he never sold grain except oats to Truesdel, and he sold one pick–up load of beans to M.F.A. None of these sales were for cash. Most grain was sold through the use of railroad grain cars. Collins never directed anybody to sell grain to raise needed cash (for payroll). Appellant got into a situation, without permission from Collins, but with his knowledge, of writing checks for business purposes, and Collins did not stop him.

Mike Dunbar worked at Boss. Appellant was the only person who directed him to take grain to Truesdel's, and told him to have the checks made out to "Bob Murray." Dunbar used his own truck most of the time in hauling grain to Truesdel's. Some checks were taken back to appellant and others "he told him just to go on and take to Sturgeon and cash them." He gave the cash to appellant when he cashed the checks, at which time appellant would either stick it in the drawer or in his pocket. Dunbar also hauled grain to M.F.A., got cash or checks made to him at first, and usually bought feed with all the cash at Central Soya. If there was money left over, Central Soya would put it on Boss' account. Sometimes, when Dunbar brought back cash, appellant would give him some of it to go to Central Soya to get some feed or something.

Gene Truesdel, president of Truesdel Brothers Grain, Clark, Missouri, knew Mike Dunbar who was employed by Boss in 1976, and he bought grain from him that year, which grain arrived by truck. Gene accepted the grain figuring that it came from Boss. He identified these Truesdel checks, received in evidence, and described as follows: 7–29–76, $787.00, payable to Bob Murray, for oats, endorsed "Bob Murray For Deposit Only Boss Feed and Fertilizer Co."; 8–3–76, $913.73, payable to Bob Murray, for beans, also endorsed "Bob Murray. For deposit only" Boss Feed Co.; 8–4–76, $266.98, payable to Bob Murray, for beans, endorsed "Bob Murray Mary Spangler" (Mary Spangler was an employee of Boss); 8–10–76, $1,553.17, payable to Bob Murray, for beans, and also endorsed "Bob Murray Mary Spangler"; 8–17–76, $752.98, payable to Bob Murray for beans, endorsed "Bob Murray c/o Robert G. Murray (Conduit)"; 8–25–76, $1,407.63, payable to Bob Murray, for beans, endorsed "Bob Murray Mike Dunbar"; 8–26–76, $814.53, payable to Bob Murray, for beans, endorsed "Bob Murray Mike Dunbar"; 9–1–76, $2,166.13, payable to Bob Murray, for wheat, endorsed "Bob Murray Mike Dunbar"; 9–3–76, $786.60, payable to Bob Murray, for wheat, endorsed

"Bob Murray c/o Robert G. Murray (Conduit)"; 9–10–76, $706.66, payable to Bob Murray, for wheat, endorsed "Bob Murray Mike Dunbar"; 9–22–76, $906.00, payable to Bob Murray, for beans, endorsed "Bob Murray Mike Dunbar"; 9–24–76, $412.58, payable to Bob Murray, for beans, endorsed "Bob Murray" (only); 10–26–76, $1,642.76, payable to Bob Murray, for beans, endorsed "Bob Murray"; 10–26–76, $2,258.88, payable to Bob Murray, for beans, endorsed "Bob Murray Mike Dunbar"; 10–27–76, $1,424.68, payable to Bob Murray, for beans, endorsed "Bob Murray c/o Robert G. Murray (conduit̲t̲)"; 11–9–76, $2,045.93, payable to Bob Murray, for beans endorsed "Bob Murray (Conduit̲t̲)". Gene matched the company tickets with the checks to show what it purchased on each. It was not explained as to the endorsement "c/o Robert G. Murray, Conduit," but it does appear in the record that appellant's son, Bob, Jr., was employed at Boss' during the times in question. According to Gene, the checks issued to Bob Murray, excluding those which were endorsed for deposit only to Boss, totalled $24,412.36.

Tom Hopkins, whose duties were similar to those of Case, testified that he went to Boss on March 15, 1976, with Dick Mauser. At that time Boss' books were so out of line that no audit could be made, so Hopkins gave it 15 days to reconstruct its records. He spoke to Dick Collins, his father, Howard Collins, and to appellant about it. On return on March 30, 1976, Hopkins found that Boss was short 2,685 bushels of soybeans, and he directed it to correct it by buying in grain within 10 days. Hopkins testified that there was a drop in Boss' wheat obligations from September to October 1976. In October, 1976, there was a check and stub register indicating a payment to Glen Isringhausen in the approximate amount of $20,000. Hopkins saw the actual check during the audit of December 1, 1976, and the check was blank–it had never been issued. The Isringhausen storage account was dropped in the October audit and was returned in December when Hopkins found out that the account had not been paid to Isringhausen. Appellant

signed the October audit, from which Isringhausen's storage account had been dropped, as being true and correct. The accounts of Mrs. White (R. Hayes, her tenant), and Glenwood Spurling had appeared on the May, 1976, audit, but they had been dropped in the September audit. So also with the account of Arthur Duffield.

Phillip Eugene Stuttsman, a Regulatory Services Accountant for the Department of Agriculture, inspected the records of Central Soya. He found that in 1976 that company was paid by Boss $8,116.66 in cash. In that year Central Soya had received $148,322.05 in checks from other sources.

For appellant, Juanita Frost testified. She worked for Boss from 1972 until April, 1976, when appellant told her that business had dropped off and he did not need her services any longer. Mary Spangler worked for Boss at the same time as Juanita. Juanita kept Boss' general ledger–accounts receivable and payable, weighed the scales (although she did not have a license to do so, and being taught to perform that task by Dick Collins), made tickets at the counter and waited upon customers. She did not remember appellant telling her to short weigh grain on trucks, but testified it was common practice to do so and Collins so instructed her.

In rebuttal, Phillip Stuttsman testified that Juanita Frost told him that appellant told her that the scales had been tampered with by a weight in some manner so as to short–weigh farmers. Also she was instructed by appellant intentionally to make mistakes on tickets, then apologize if it was detected and then make corrections.

■ The first point considered is the submissibility of the state's case. The evidence shows this: Each of the eleven victims as above charged deposited grain with Boss. The amounts of their deposits, whether wheat or soybeans, are detailed in the evidence. Each type of grain constituted commingled, fungible goods, no part thereof, except as to amounts, being identifiable property of each of the alleged victims. See the definitions of "fungible goods", 37

C.J.S. Fungible Goods, p. 1407, and pocket part. There was no authority granted to appellant by Boss, or its principal owner, Dick Collins, to sell grain to Truesdel Brothers Grain Company—most grain was sold by rail, not locally (which according to Collins would result in less price received). Appellant, through his apparent cats–paw, Mike Dunbar, as the jury could find, ordered grain belonging to the various alleged victims hauled from Boss by Mike, who was instructed to have checks for sales made by Truesdel, payable to appellant. None of the victims received payment for their deposited grain, and none gave consent to have their grain moved or sold. It was their property under the storage arrangements with Boss. The total of the checks issued by Truesdel, payable to Bob Murray, exclusive of those which were endorsed for deposit only to Boss, totalled $24,412.36. Only slightly in excess of $8,100 was paid in cash to Central Soya for feed. Other checks were cashed by appellant, although some were endorsed also by Mike Dunbar, Mary Spangler and Robert G. Murray, "conduit". The September 1976 audit did not include amounts due Isringhausen, that being excluded because of the check stub exhibited by appellant, it being later learned that the check corresponding to the stub had never been issued, causing Isringhausen's account to be reestablished in December, 1976. Other accounts, Mrs. Ethel White Glenwood Spurling and Arthur Duffield disappeared from the records in September or October audits, only to show up later as extant. Appellant received cash from Dunbar, and placed some of it in his pocket. The jury could infer a criminal intent from appellant's statement that it was more profitable to act outside the law. All of the evidence above set forth, and considered in its light most favorable to the state, sustains the jury's verdict and appellant's contention to the contrary is overruled.

■ As to appellant's first contention that the amended information did not state a specific time that the crime was committed, the law is clear that the state need not do so unless time is of the essence. The former crime of embezzlement was incorporated into the stealing statute, § 560.156, RSMo 1969, when it was enacted in 1955. It was held in *State v. Woodward*, 130 S.W.2d 474, 475[4, 5] (Mo. 1939), that a charge of embezzlement (closely akin to the facts here) on the allegation that "the act was done between the _____ day of July, 1937, and the 4th day of May, 1938, was sufficient. The averment that the crime occurred between certain dates is sufficient to establish a single act of embezzlement." See also *Tucker v. Kaiser*, 176 S.W.2d 622, 624 (Mo. banc 1944), holding that an amended information charging defendant with taking money in his possession as administrator " 'on or about the 15th day of October A.D., 1942, and on other dates within a period of three years prior' " (to that date) was sufficient. And note *State v. Newhart*, 539 S.W.2d 486, 490 (Mo.App. 1976), a stealing case, wherein the court held that time was not of the essence of the offense because it was of "no real significance * * whether he committed the offense on December 31, 1970, January 5, 1971, or on another date." See also § 545.030.1(5), RSMo 1969, providing that no indictment or information shall be deemed invalid for omitting to state the time at which the crime was committed where time is not of the essence thereof. The evidence clearly shows that the stealings here occurred within the times alleged, March 15, 1976, and November 15, 1976, and the allegations as to those times were sufficient to apprise appellant of the offenses charged and to bar another prosecution therefor. The point is overruled.

■ The third point is that the amended information charged offenses significantly different than the original charges. The original information is not in the transcript but it is gleaned from the briefs that for each of the eleven counts there was a specific dollar value alleged and the amount of grain allegedly stolen. It was also alleged that the grain was stolen between the date each individual farmer brought his grain to Boss and the date Boss was closed by the Department of Agriculture. As above set forth, the amended information charged

that the thefts occurred between March 15, 1976 and November 15, 1976 (the evidence being that this period of time was when appellant was employed at Boss), and it changed the former allegation of specific dollar amounts to over fifty dollars, and the specific amount of grain to "many bushels". Appellant argues that he was prejudiced because he had prepared to defend (for some three years prior) on certain amounts and of values, and on the basis that some of the grain had been delivered to Boss and had disappeared before his arrival, and some had disappeared after he left, therefore his ability to defend was diminished significantly. It is not here pointed out what evidence there would have been as to disappearance of grain from Boss prior to and after appellant's employment with that company, or how it would bear upon the state's proof of thefts occurring between the times alleged in the amended information. The proof of thefts still would have been within the times originally alleged. All that is required under §§ 560.156 and 560.161 is to allege that property was taken and it had a value of at least fifty dollars. No different offense was charged in the amended information. The evidence offered by appellant would have been equally applicable to either information. *State v. Taylor*, 375 S.W.2d 58, 63 (Mo. 1964); *State v. Wilson*, 544 S.W.2d 859, 862[1–3] (Mo. App. 1976), holding that the test of prejudice in allowing an amendment is that of the statement, supra, in the *Taylor* case. No prejudice appears here. The third point is overruled.

The judgment is affirmed.

All concur.